******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

MOZZELLE BROWN *v.* COMMISSIONER
OF CORRECTION
(AC 46658)

Suarez, Clark and Lavine, Js.

*Syllabus*

The petitioner, who had been convicted of murder and conspiracy to commit murder, appealed following the habeas court's denial of his petition for certification to appeal from the court's judgment denying his habeas corpus petition. The petitioner claimed, inter alia, that the court erred in concluding that he had procedurally defaulted on his claim under *Brady* v. *Maryland* (383 U.S. 83) that his right to due process was violated because the state failed to disclose evidence favorable to his defense regarding an agreement or understanding it had with a cooperating witness, F, to provide her consideration concerning criminal charges against her in exchange for her testimony at his criminal trial. *Held*:

The habeas court abused its discretion in denying the petition for certification to appeal, as the petitioner's *Brady* claim was debatable among jurists of reason, a court could resolve the claim in a different manner and the questions involved were adequate to deserve encouragement to proceed further.

The habeas court incorrectly concluded that the petitioner's *Brady* claim was procedurally defaulted because he failed to demonstrate the existence of an undisclosed agreement between the state and F.

The state's suppression of statements to F that it had a practice of providing consideration to cooperating witnesses suggested that it had an informal understanding with her to do so in exchange for her testimony, and those statements, which were material to the petitioner's defense, gave rise to a reasonable probability that the result of the criminal trial would have been different had they been disclosed.

Accordingly, the habeas court's judgment was reversed, and the case was remanded with direction to grant the petition for a writ of habeas corpus, to vacate the petitioner's convictions, and to order a new trial on the charges of murder and conspiracy to commit murder.

Argued September 4, 2024—officially released January 28, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *M. Murphy, J.*; thereafter,

the petition was withdrawn in part; judgment denying the petition; subsequently, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Reversed*; *judgment directed.*

*Nicole P. Britt*, assigned counsel, with whom, on the brief, was *Christopher Y. Duby*, assigned counsel, for the appellant (petitioner).

*Timothy F. Costello*, supervisory assistant state's attorney, with whom, on the brief, were *Paul J. Narducci*, state's attorney, and *Donna M. Fusco*, deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

SUAREZ, J. The petitioner, Mozzelle Brown, appeals from the judgment of the habeas court denying his third amended petition for a writ of habeas corpus. The petitioner claims that the court erred in (1) denying his petition for certification to appeal and (2) concluding that his due process claim related to the state's failure to disclose an agreement or understanding between the prosecutor and a cooperating witness was procedurally defaulted.[1] We agree with the petitioner that the habeas court abused its discretion in denying the petition for certification to appeal. We also agree with the petitioner that the habeas court erred in refusing to consider the merits of his due process claim. After reaching the merits of that claim, we conclude that the alleged constitutional violation exists and that he is entitled to a new trial. Accordingly, we remand the case to the habeas court with direction to render judgment granting the petition for a writ of habeas corpus, to vacate the petitioner's conviction of conspiracy to commit murder in

---

[1] The petitioner also claims that the court improperly rejected on its merits his claim that he was deprived of the effective assistance of trial counsel. In light of the relief that we afford the petitioner in connection with his second claim, including a new trial on his criminal charges, it is unnecessary for us to consider the merits of his third claim.

violation of General Statutes §§ 53a-54a and 53a-48 (a) and murder in violation of General Statutes §§ 53a-54a (a) and 53a-8, and to order a new trial on those offenses.

The record reflects the following procedural history. In October, 2014, the petitioner was convicted, following a jury trial, of conspiracy to commit murder and murder.[2] In its memorandum of decision denying the petition for a writ of habeas corpus, the habeas court found the following facts: "On the evening of May 14, 2004, [the body of the victim, Dr. Eugene Mallove] was discovered in the driveway of his rental property at 119 Salem Turnpike in Norwich, Connecticut (119 Salem). During its investigation, Norwich police determined that [the victim] had recently evicted the tenants of 119 Salem, Roy and Patricia Anderson, the month prior, and he had traveled from his primary residence in New Hampshire to clean out the property. Chad Schaffer, Patricia Anderson's son, and his girlfriend, Candace Foster, had also lived at the property. The police spoke with Schaffer and Foster. Schaffer informed the police that he had never met [the victim] and that his family never had any personal problems with him during the eviction process. Foster told the police that Schaffer had been home with her and their child at their current apartment at ArtSpace Apartments, located at 35 Chestnut Street, Norwich, Connecticut, that entire day and evening. [The victim's] vehicle, a green minivan, was discovered at the Foxwoods Casino employees parking lot in Ledyard, Connecticut, on May 15, 2004. A folding knife with the initials 'D.E.' was recovered near [the victim's] body.

"On May 16, 2004, the New Britain police informed Norwich police that they had two men, Gary McAvoy

---

[2] The jury found the petitioner not guilty of felony murder in violation of General Statutes § 53a-54c and robbery in the first degree in violation of General Statutes § 53a-136 (a).

and Joseph Reilly, in custody with suspicious injuries and bloodlike stains on their clothing. Andrew Nickerson, a local shuttle bus driver, identified Reilly from a photo lineup as a potential driver of a green van near Mohegan Sun casino on the night of the murder. Reilly and McAvoy were arrested for [the victim's] homicide in the summer of 2005. On September 15, 2005, a trial court determined [that] there was probable cause to charge Reilly and McAvoy for [the victim's] death. During subsequent investigation, the Norwich police eliminated Reilly and McAvoy as the source of any DNA profiles related to [the victim's] death, and the state entered a nolle on all charges against them.

"In 2009, Jill Sebastian contacted the police with information that the former tenants at 119 Salem may have been involved in [the victim's] death. Sebastian, who had lived with Schaffer, Foster, and Sebastian's boyfriend, Keishon Dullivan, in ArtSpace, informed the police that she had seen Schaffer's bloody clothing in the apartment, and that Foster had admitted to lying about Schaffer being home on the night of the murder and had disposed of Schaffer's bloody pajama pants. Dullivan also spoke with the police, indicating that he saw Schaffer's basketball jersey on the apartment floor covered in blood and that Schaffer had told him that he had assaulted [the victim] with the petitioner at 119 Salem and took [the victim's] possessions to stage the attack as a robbery.

"Foster met with the police to provide her first written statement and was placed in witness protection with her two children. Foster provided the police with several different versions about what occurred on the night of the incident. In her final statement to the police on March 23, 2010, Foster admitted that she had kicked [the victim] and hit him with a pipe. Foster claimed that Schaffer hit her during the incident, causing her nose to bleed. Foster further indicated that she drove

[the victim's] van and parked it at Foxwoods and that Schaffer took several of the [victim's] possessions.

"On April 1, 2010, Foster and Schaffer were arrested for their involvement in [the victim's] homicide. The state extended Schaffer a plea offer during his criminal trial and, on April 20, 2012, Schaffer pleaded guilty to manslaughter in the first degree and robbery in the third degree charges. The petitioner was arrested for his role in [the victim's] death on November 20, 2013 . . . [and was later convicted of murder and conspiracy to commit murder]. Foster pleaded guilty to hindering prosecution in the second degree and tampering with physical evidence in May, 2015. State's Attorney Paul [J.] Narducci represented the state in all three cases."

The petitioner was represented at trial by Attorney Richard Marquette. In January, 2015, the trial court, *Jongbloed, J.*, imposed a total effective sentence of fifty-eight years of incarceration. The petitioner, represented by Attorney Max Simmons, filed a direct appeal. Later, Simmons withdrew his appearance, and the petitioner withdrew his appeal.

On September 25, 2017, the petitioner, in a self-represented capacity, filed a petition for a writ of habeas corpus. On November 27, 2021, the petitioner, represented by counsel, filed a third amended petition, the resolution of which is the subject of this appeal. In count one, the petitioner raised two distinct freestanding due process claims. First, he alleged that the prosecution violated his due process right to a fair trial by "fail[ing] to correct false testimony [from Foster at the criminal trial] and/or to disclose material, exculpatory evidence to the petitioner and/or Marquette." Specifically, the petitioner alleged that, in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the prosecution failed to disclose that there was

an actual or implied agreement between the prosecution and Foster for her testimony in exchange for consideration related to her pending criminal charges and convictions. Second, in conjunction with his *Brady* claim, the petitioner alleged that, in violation of *Napue* v. *Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), and its progeny, the prosecution failed to correct Foster's trial testimony that no promises were made to her in exchange for her testimony and that she did not expect to receive a benefit in exchange for her testimony. In count two, the petitioner alleged that Marquette did not provide him with effective assistance of counsel in twelve ways, including by "fail[ing] to properly identify, plead, or litigate the [*Brady*] claim raised in count one . . . of this petition . . . ." In count three, the petitioner alleged that the attorney who represented him in connection with his direct appeal, Simmons, did not provide him with effective assistance in that he failed to claim on appeal that the trial court had erred in denying his motion for a new trial.

The respondent, the Commissioner of Correction, filed a return in which he either denied the substantive allegations of the petition or left the petitioner to his proof. With respect to count one, however, the respondent also raised the affirmative defense of procedural default in that "[the petitioner] did not raise these claims in any motions in the trial court and appeal the denial therefrom or on direct appeal." The respondent alleged that the petitioner could not overcome the procedural default because he was unable to establish either cause or prejudice sufficient to excuse his default. In his reply, the petitioner alleged that his allegations of ineffective assistance on the part of Marquette and Simmons, if proven, were sufficient to overcome the procedural default. The petitioner also alleged that a failure to consider the merits of the due process claims in count one would result in a manifest miscarriage of justice.

A trial on the merits of the habeas petition occurred on March 7 and November 18, 2022. In addition to presenting many documentary exhibits, including but not limited to the court file for and transcript of the petitioner's criminal trial, the petitioner also presented testimonial evidence from the following witnesses: Robert Powers, a forensic toxicologist; Jeffrey Kaplan, an expert in forensic psychology; Marquette; and Frank Riccio, a defense attorney who testified as an expert witness for the petitioner. The respondent presented testimony from Narducci and submitted into evidence a note that Narducci had authored and put into Foster's criminal file. Both parties filed posttrial briefs.

In its memorandum of decision, the habeas court, *M. Murphy, J.*, concluded that "the due process claim in count one" was procedurally defaulted, and it did not reach the merits of the claim. With respect to the twelve allegations of ineffective assistance set forth in count two, the court concluded that the petitioner had not sustained his burden of proving either deficient performance or prejudice.[3] The court did not reach the merits of the claim set forth in count three of the petition after it determined that the petitioner had abandoned that claim by failing to address it in his posttrial brief. Following the court's denial of the petition for a writ of habeas corpus, the petitioner filed a petition for certification to appeal, which the court also denied. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

First, we address the petitioner's claim that the habeas court improperly denied his petition for certification to appeal. We agree with the petitioner.

---

[3] Earlier in its decision, the court noted that, in his posttrial brief, the petitioner withdrew one of his allegations of ineffective assistance, namely, a claim that Marquette had violated his right to adequate representation by failing to argue before the jury during closing argument that DNA evidence did not support Foster's testimony.

General Statutes § 52-470 (g) provides: "No appeal from the judgment rendered in a habeas corpus proceeding brought by or on behalf of a person who has been convicted of a crime in order to obtain such person's release may be taken unless the appellant, within ten days after the case is decided, petitions the judge before whom the case was tried or, if such judge is unavailable, a judge of the Superior Court designated by the Chief Court Administrator, to certify that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies."

It is well settled that, "[f]aced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [a] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and applicable legal principles. . . . If the petitioner succeeds in surmounting that hurdle, the petitioner must then demonstrate that the judgment of the habeas court should be reversed on its merits." (Internal quotation marks omitted.) *Ayuso* v. *Commissioner of Correction*, 215 Conn. App. 322, 332, 282 A.3d 983, cert. denied, 345 Conn. 967, 285 A.3d 736 (2022).

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying [claim] to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive [claim] for the purpose of

ascertaining whether [that claim satisfies] one or more of the three criteria . . . adopted by [our Supreme Court] for determining the propriety of the habeas court's denial of the petition for certification." (Internal quotation marks omitted.) Id.

In light of our analysis in part II of this opinion, we are persuaded the petitioner's challenge to the habeas court's analysis of and resolution of his *Brady* claim is debatable among jurists of reason, a court could resolve the issues in a different manner, and the questions are adequate to deserve encouragement to proceed further. Accordingly, we conclude that the court abused its discretion in denying the petition for certification to appeal.

## II

Next, we address the petitioner's claim that the court erred in concluding that the *Brady* claim set forth in count one of his petition was procedurally defaulted. The petitioner argues that the court incorrectly analyzed the claim and that it relied on an improper finding of fact as to whether the prosecutor had an agreement with Foster.[4] We agree with the petitioner.

---

[4] One of the claims in the petitioner's brief is that "[t]he habeas court erred in finding that there was no *Brady* violation." However, as we explain in greater detail herein, and as recognized by the petitioner in his appellate brief, the court did not reach the merits of the petitioner's *Brady* claim after concluding that, in light of its findings in connection with the petitioner's claim of ineffective assistance of trial counsel, the petitioner had failed to prove cause and prejudice to overcome the respondent's claim of procedural default. Having carefully reviewed the substance of the petitioner's arguments, they reflect the petitioner's belief that, in disposing of the ineffective assistance of counsel claim in count two, the court improperly found that an undisclosed agreement between the state and Foster did not exist.

Another of the petitioner's claims on appeal is that "[t]he habeas court erred in finding that the petitioner procedurally defaulted count one." In connection with this claim, the petitioner argues that the court misapplied the doctrine of procedural default by improperly conflating the due process claims in count one and the ineffective assistance of counsel claim set forth in his petition. In this part of the opinion, we address the substance of both interrelated claims.

As stated previously in this opinion, the petitioner alleged in count one that the prosecution "inadvertently failed to correct false testimony and/or to disclose material, exculpatory evidence to the petitioner and/or Marquette." At the habeas trial and presently, the petitioner asserts that an undisclosed "agreement or understanding" existed between Narducci and Foster whereby Foster would receive consideration from the state in connection with the pending criminal charges against her in exchange for her testimony implicating the petitioner in the events culminating in the victim's death. At the habeas trial, the petitioner attempted to demonstrate the existence of this undisclosed agreement or understanding by means of a memorandum that Narducci had generated and put into Foster's criminal file following his conviction, as well as Narducci's testimony at the habeas trial concerning statements that he made to Foster prior to her testimony. The petitioner also relied on undisputed evidence that, following his trial, Foster received favorable treatment from the state in connection with charges that had been pending against her related to the events at issue and that Narducci brought her cooperation to the attention of the court at the time of her sentencing on those charges. The petitioner claimed that, in violation of *Brady*, the prosecution did not disclose the existence of this agreement or understanding to the petitioner, it was favorable to the defense because it was valuable impeachment evidence, and it was material because there is a reasonable likelihood that evidence of the undisclosed agreement or understanding might have affected the verdict.

The court's analysis of procedural default, in count one, is legally intertwined with its resolution of the petitioner's claim, in count two, that Marquette had rendered ineffective assistance in that he failed to identify, plead, or litigate a claim with respect to the state's

failure to disclose an agreement with Foster. In dispos-
ing of count one, the court set forth principles related
to the affirmative defense of procedural default on
which the state relied.[5] The court stated that a petitioner
may satisfy the cause and prejudice requirement neces-
sary to defeat the defense by means of a successful
ineffective assistance of counsel claim. Without reach-
ing the merits of the due process claims in count one,
the court then concluded that, "[b]ecause the petitioner
alleges ineffective assistance of trial counsel as the
cause and prejudice, a claim already alleged in count
two, the court concludes that procedural default bars
the due process claim in count one. The due process
claim in count one need not be separately addressed
because it is subsumed within the claim in count two."
In support thereof, the court cited the following propo-
sition set forth in *Braham* v. *Commissioner of Correc-*

[5] As stated previously in this opinion, in addition to raising a claim under
*Brady*, the petitioner also claimed in count one that his right to due process
was violated when the prosecution failed to correct Foster's trial testimony
that no promises were made to her in exchange for her testimony and that
she did not expect to receive a benefit in exchange for her testimony. The
court, however, described count one as a "due process *claim*" under *Brady*,
specifically, "that [the petitioner's] right to due process was violated because
the state failed to disclose an agreement between the state and the state's
witness, Foster." (Emphasis added.) The court did not distinctly address
the separate due process claim based on the state's alleged failure to correct
Foster's testimony.

We conclude in connection with the petitioner's *Brady* claim that the
case should be remanded with direction to render judgment granting the
petition for a writ of habeas corpus, to vacate the petitioner's criminal
convictions, and to order a new trial on those offenses. Accordingly, it is
unnecessary for us to resolve a claim of error related to the petitioner's
separate but interrelated due process claim brought under *Napue*. Neverthe-
less, we observe that, in light of our conclusion that a *Brady* violation
occurred related to an undisclosed understanding between the prosecutor
and Foster, it follows as a matter of law that the state likewise violated the
petitioner's right to due process based on the prosecutor's failure to correct
or clarify Foster's misleading testimony at the petitioner's criminal trial that
the prosecutor had not offered her any consideration in exchange for her
testimony and that what transpired at the trial would not affect what hap-
pened to her in connection with her pending criminal charges.

*tion*, 72 Conn. App. 1, 13, 804 A.2d 951, cert. denied, 262 Conn. 906, 810 A.2d 271 (2002): "A habeas court need not . . . separately address due process claims subsumed by claims of ineffective assistance of counsel. The habeas court's finding that the petitioner was not prejudiced by any of the alleged improprieties of . . . counsel necessarily disposed of the petitioner's due process claims as well." (Internal quotation marks omitted.)

As stated previously in this opinion, in his reply to the respondent's affirmative defense of procedural default with respect to the due process claims in count one, the petitioner relied on the allegation of ineffective assistance on the part of Marquette and Simmons as the cause that prejudiced him necessary to overcome the claimed procedural default. In count two, the court considered and rejected the petitioner's claim that Marquette had rendered ineffective assistance by virtue of his failure to raise a claim at trial related to the alleged undisclosed agreement between the state and Foster. In so concluding, the court relied on its dispositive factual finding that "the petitioner failed to demonstrate the existence of an undisclosed agreement through which Foster would receive consideration from the state in exchange for her testimony at the petitioner's trial." Consequently, the court concluded that the petitioner had failed to establish either deficient performance or prejudice with respect to the claim that Marquette failed to identify, plead, or litigate a claim with respect to the state's alleged failure to disclose a plea agreement with Foster.

For several reasons, the petitioner presently argues that the court's analysis of the *Brady* claim was flawed. The petitioner argues that the court improperly focused on his reply to the return, in which he relied on the claim of ineffective representation. The petitioner argues that the court ignored an additional ground of cause and

prejudice that he raised in his posttrial brief, specifically, "that Marquette could not properly raise the *Brady* violation at trial because the state not only did not disclose, but vehemently denied, any agreement or understanding with [Foster]." The petitioner effectively argues that the court could not properly have concluded that his *Brady* claim was procedurally defaulted because the claim was based on the state's alleged failure to fulfill its obligation to disclose the representations that Narducci had made to Foster. Such nondisclosure, the petitioner asserts, necessarily impeded his defense counsel's efforts to raise the claim at the time of trial. The petitioner also argues that, even if Narducci's representations had been disclosed, the state, not Marquette, had the duty to correct Foster's trial testimony concerning the same. Although the petitioner also relied on ineffective assistance of trial counsel as the cause and prejudice to excuse the procedural default, he argues presently that the alleged failures of the prosecutor, on the one hand, and Marquette, on the other hand, are "mutually exclusive" and the court improperly "mischaracterized the nature of the claims and improperly concluded that count two subsumed count one."

The respondent argues both that it was improper for the petitioner to attempt to raise a new ground to establish cause and prejudice in his posttrial brief and that the record is inadequate to review this ground in light of the fact that the habeas court did not specifically address it. In light of this court's analysis in *Gaskin* v. *Commissioner of Correction*, 183 Conn. App. 496, 193 A.3d 625 (2018), the habeas court should have considered the merits of the *Brady* claim in its evaluation of the claimed procedural default. Moreover, for the reasons that follow, we conclude that the record is adequate for this court to consider the merits of that claim.

In connection with the present claim, the petitioner also challenges the court's factual finding, made in connection with its analysis of the petitioner's claim of ineffective assistance, that the petitioner failed to prove the existence of an undisclosed agreement between the state and Foster by which Narducci offered Foster consideration in exchange for her testimony at the petitioner's criminal trial. Because the court clearly relied on that finding in concluding that the petitioner's due process claims were procedurally defaulted, such finding is properly before us for review in connection with the present claim.

Before discussing the merits of the claim, we set forth some general principles that govern *Brady* claims. "The law governing the state's obligation to disclose exculpatory evidence to defendants in criminal cases is well established. The defendant has a right to the disclosure of exculpatory evidence under the due process clauses of both the United States constitution and the Connecticut constitution. . . . In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material. . . .

"The state's failure to disclose an agreement with a cooperating witness may be deemed to be the withholding of exculpatory evidence. Impeachment evidence falls within *Brady*'s definition of evidence favorable to an accused. . . . Impeachment evidence is broadly defined in this context as evidence that could potentially alter the jury's assessment of a witness' credibility. . . . Specifically, [our Supreme Court has] noted that [a] plea agreement between the state and a key witness is impeachment evidence falling within the . . . *Brady* doctrine. . . .

"The prerequisite of any claim under . . . *Brady* . . . [pertaining to the failure to disclose an agreement

with a cooperating witness] . . . is the existence of an undisclosed agreement or understanding between the cooperating witness and the state. . . . Normally, this is a fact based claim to be determined by the trial court, subject only to review for clear error. . . . [T]he burden is on the defendant to prove the existence of undisclosed exculpatory evidence." (Citations omitted; internal quotation marks omitted.) *Moore* v. *Commissioner of Correction*, 227 Conn. App. 487, 497–99, 321 A.3d 470, cert. granted, 350 Conn. 924, 326 A.3d 247 (2024); see also *State* v. *Ouellette*, 295 Conn. 173, 185–87, 989 A.2d 1048 (2010).

"Whether the petitioner was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review. . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record." (Citation omitted; internal quotation marks omitted.) *Walker* v. *Commissioner of Correction*, 103 Conn. App. 485, 491, 930 A.2d 65, cert. denied, 284 Conn. 940, 937 A.2d 698 (2007). A reviewing court affords plenary review to a habeas court's determination that a due process claim has been procedurally defaulted. See, e.g., *Saunders* v. *Commissioner of Correction*, 343 Conn. 1, 10, 272 A.3d 169 (2022).

In contrast, "[w]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . [T]his court

does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [habeas] [court's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Citation omitted; internal quotation marks omitted.) *Moore* v. *Commissioner of Correction*, supra, 227 Conn. App. 499–500.

We first consider the petitioner's argument that the court improperly applied the procedural default doctrine to his *Brady* claim. Under the procedural default doctrine, "a claimant may not raise, in a collateral proceeding, claims that he could have made at trial or on direct appeal in the original proceeding and . . . if the state, in response, alleges that a claimant should be procedurally defaulted from now making the claim, the claimant bears the burden of demonstrating good cause for having failed to raise the claim directly, and he must show that he suffered actual prejudice as a result of this excusable failure." *Hinds* v. *Commissioner of Correction*, 151 Conn. App. 837, 852, 97 A.3d 986 (2014), aff'd, 321 Conn. 56, 136 A.3d 596 (2016). Our Supreme Court has explained that, "although federal postconviction jurisprudence does not bind us, this court has adopted the procedural default standard articulated in *Wainwright* v. *Sykes*, 433 U.S. 72, 87, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977). . . . Under this standard, the petitioner must demonstrate good cause for his failure to raise a claim at trial or on direct appeal and actual prejudice resulting from the impropriety claimed in the habeas petition. . . . The cause and prejudice standard is designed to prevent full review of issues in habeas corpus proceedings that counsel did not raise at trial or on appeal for reasons of tactics, [inadvertence] or ignorance . . . . The procedural default doctrine is a

prudential limitation on the right to raise constitutional claims in collateral proceedings that vindicates the interests of finality of judgments and uniformity." (Citations omitted; internal quotation marks omitted.) *Saunders* v. *Commissioner of Correction*, supra, 343 Conn. 9.

"Although ineffective assistance of counsel . . . is the most commonly asserted basis for cause to excuse procedural default . . . it is not the exclusive basis. . . . [T]he cause requirement may be satisfied under certain circumstances when a procedural failure is not attributable to an intentional decision by counsel made in pursuit of his client's interests. . . . [T]he failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the requirement is met." (Citation omitted; internal quotation marks omitted.) *Kukucka* v. *Commissioner of Correction*, 225 Conn. App. 159, 165, 314 A.3d 631, cert. denied, 350 Conn. 904, 323 A.3d 342 (2024).

This court has discussed the proper application of the procedural default doctrine to *Brady* claims, noting that "[o]ur Supreme Court has recognized that the showing of prejudice under the procedural default doctrine is the same showing of prejudice that is required for . . . *Brady* errors . . . and the United States Supreme Court has observed that [c]ause and prejudice . . . parallel two of the three components of . . . *Brady* . . . . Corresponding to the second *Brady* component (evidence suppressed by the [s]tate), a petitioner shows cause when the reason for his failure to develop facts in state-court proceedings was the [s]tate's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the cause and prejudice requirement exists when the suppressed evidence is material for *Brady* purposes. . . . Thus, if [a petitioner] succeeds in demonstrating cause and prejudice, he will at the same time succeed in establishing the

elements of his . . . *Brady* . . . due process claim. . . . *Banks* v. *Dretke*, 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004).

"We fail to see how the converse is not also true, namely, that the petitioner establishes cause and prejudice by establishing the suppression of material exculpatory evidence under *Brady* and its analogues. . . . We are not at liberty to overrule this court's or our Supreme Court's precedents applying the procedural default doctrine to due process claims under *Brady* and its analogues . . . however, we believe the prudential considerations underlying the doctrine would warrant looking past procedural default to address the merits . . . of such claims." (Citations omitted; internal quotation marks omitted.) *Gaskin* v. *Commissioner of Correction*, supra, 183 Conn. App. 513–14.

In concluding that the *Brady* claim at issue in *Gaskin* had not been procedurally defaulted, this court in *Gaskin* was guided by the fact that the *Brady* claim before it was based on extrarecord information of which the petitioner's appellate counsel was unaware. See id., 516. The court in *Gaskin* thus carefully distinguished the claim before it from the *Brady* claim that this court deemed to be procedurally defaulted in *Salters* v. *Commissioner of Correction*, 141 Conn. App. 81, 60 A.3d 1004, cert. denied, 308 Conn. 932, 64 A.3d 330 (2013), stating: "In *Salters* . . . this court held that the petitioner procedurally defaulted his *Brady* claim because, at the time of his criminal trial, he and his trial counsel were aware of a cooperating witness' history of arrests that they claimed for the first time at the habeas trial the state had failed to disclose. Specifically, the petitioner's trial counsel discussed at length his theories as to the existence of the witness' records, but he did not ask for an evidentiary hearing at that time. . . . Counsel did not seek further disclosure from the state at trial,

and the petitioner did not claim a *Brady* violation in his direct appeal. . . .

"This case is distinguishable from *Salters* because the petitioner's appellate counsel could not have developed a due process claim without extrarecord information of which she was unaware. We note that the petitioner's appointed appellate counsel, a highly experienced appellate attorney, had only the record in front of her in determining to move to withdraw as counsel. *Anders* requires only that appellate counsel look to the entire record in deciding whether there are appealable issues. *Anders* v. *California*, 386 U.S. 738, 744, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967). We conclude that it runs contrary to the spirit of *Anders* to then impose on appellate counsel the additional duty of investigating if there are also any possible claims outside of the record to determine if additional claims are viable." (Citations omitted; internal quotation marks omitted.) *State* v. *Gaskin*, supra, 183 Conn. App. 518–19.

Thus, this court's analysis in *Gaskin* supports the petitioner's argument that the habeas court should have considered whether the state's failure to disclose the understanding that Narducci had reached with Foster was sufficient to overcome the respondent's claim of procedural default, not merely whether Marquette's alleged ineffective assistance amounted to cause and prejudice. As was the case in *Gaskin*, the *Brady* claim at issue in the present case could not have been developed by the petitioner's appellate counsel because it was based on extrarecord information of which both the petitioner's trial and appellate counsel were unaware. Thus, in response to the respondent's argument that the *Brady* claim was procedurally defaulted, the court should have thoroughly analyzed whether the *Brady* claim had merit.

As stated previously in this opinion, the court's analysis appears to have rested on its factual determination

that "the petitioner failed to demonstrate the existence of *an undisclosed agreement* through which Foster would receive consideration from the state in exchange for her testimony at the petitioner's trial." (Emphasis added.) A proper evaluation of whether the petitioner's *Brady* claim had merit, however, must be guided by an understanding that the state's obligations under *Brady* are not limited to the requirement that it disclose the existence of what may be characterized as *a formal agreement* to provide some measure of consideration to a cooperating witness. Rather, "[t]he prerequisite of any claim under . . . *Brady* [pertaining to the state's failure to disclose an agreement with a cooperating witness] . . . is the existence of an undisclosed *agreement or understanding between the cooperating witness and the state.*" (Emphasis added; internal quotation marks omitted.) *Moore* v. *Commissioner of Correction*, supra, 227 Conn. App. 499. An agreement or understanding between a cooperating witness and the state is a potentially fertile ground for impeaching the credibility of a cooperating witness. See *State* v. *Ouellette*, supra, 295 Conn. 190 ("The importance of candor is particularly acute when a cooperating witness testifies on behalf of the state, which also wields power over that witness' sentencing. As one court has noted, '[i]t is difficult to imagine a greater motivation to lie than the inducement of a reduced sentence . . . .' "). As this court has observed, "[o]ur case law is clear . . . that the petitioner need not establish the existence of a formal plea agreement in order to prove a *Brady* violation. [E]vidence that merely suggests an informal understanding between the state and a state's witness may constitute impeachment evidence for the purposes of *Brady*. . . . Such evidence is by no means limited to the existence of plea agreements. . . . An agreement by a prosecutor with a cooperating witness to bring the witness' cooperation to the attention of the

judge who later sentences the witness on [her] own pending criminal charges is a deal that must be disclosed to the defendant against whom [she] testifies, even if the deal does not involve a specific recommendation by the prosecutor for the imposition of a particular sentence." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Turner* v. *Commissioner of Correction*, 181 Conn. App. 743, 758–59, 187 A.3d 1163 (2018); see also *Hines* v. *Commissioner of Correction*, 164 Conn. App. 712, 725, 138 A.3d 430 (2016) (same). Indeed, "[a]ny . . . understanding or agreement between any state's witness and the state police or state's attorney clearly falls within the ambit of *Brady* principles." *Walker* v. *Commissioner of Correction*, supra, 103 Conn. App. 493; see also *Elsey* v. *Commissioner of Correction*, 126 Conn. App. 144, 152, 10 A.3d 578 (same), cert. denied, 300 Conn. 922, 14 A.3d 1007 (2011).

It is clear from the petitioner's arguments, both before the habeas court and this court, that his *Brady* claim is not based on the existence of a formal agreement between Narducci and Foster for an agreed upon disposition, but on what he characterizes as a "suggested understanding" that, he argues, "is precisely the kind of agreement or understanding that the state is required to disclose." This argument is consistent with the principle that "[t]he purpose of requiring the state to disclose impeachment evidence to a criminal defendant is to ensure that the jury knows the facts that might motivate a witness in giving testimony . . . ." (Internal quotation marks omitted.) *State* v. *Floyd*, 253 Conn. 700, 744, 756 A.2d 799 (2000).

The habeas court was presented with undisputed evidence concerning the representations that Narducci made to Foster. Narducci testified that, at the time of the petitioner's criminal trial, Foster had pending

criminal charges in connection with the victim's homi-
cide, and she was represented by a special public
defender, Richard Kelly.[6] Narducci stated that he spoke
with Kelly in connection with interviewing Foster prior
to her testifying at trial and that Foster's testimony
was important in obtaining a conviction. The following
colloquy between the respondent's counsel and Nar-
ducci transpired:

"Q. Okay. You had testified previously that the state
made no offers to [Foster] prior to [the petitioner's]
trial?

"A. That's correct.

"Q. Okay. Did the state make that clear to [Kelly]
that there were going to be no offers regarding [Foster's]
testimony?

"A. Yes . . . that was made clear.

"Q. Okay. So, just so I'm clear, it was made clear to
both . . . Foster and [Kelly], who represented [Fos-
ter]—

"A. Yes.

"Q. —that there would be absolutely no promises or
deals regarding her testimony?

"A. That's correct. We did say at the time, and . . .
what I said virtually in all the cases that I've handled,
that we do not make any specific promises concerning
any offers that are being made. What we do tell them
[is], in the past, people who come in to testify truthfully
and accurately, that information is considered by the
prosecuting authorities in determining a recommenda-
tion. And if they do testify truthfully and completely
and accurately, that information will be made available

---

[6] We note that neither Foster nor Kelly testified at the habeas trial.

to the sentencing judge, but we do not make any promises, any specific promises, as it relates to any offense.

"Q. Okay. And do you recall [Foster] testifying at [the petitioner's] trial that she hoped for some consideration?

"A. That's correct. We also tell witnesses that . . . it's expected that you can testify that you're hoping for some consideration in exchange for your complete, accurate and truthful testimony.

"Q. Okay. And the mere fact that a witness hopes for consideration, does that guarantee that the state will give consideration after the testimony?

"A. No, it doesn't.

"Q. Okay. So, there could be times when a witness testifies for the state, hopes to get consideration, but, ultimately, does not get consideration?

"A. That is correct."

The respondent's counsel then showed Narducci a copy of a note that Narducci had authored, dated November 12, 2014, and included in Foster's criminal file. Narducci testified that he, in fact, created notes to memorialize what was occurring in Foster's case and that he inserted the note into her criminal file. The following colloquy between the respondent's counsel and Narducci then occurred:

"Q. . . . Did the state make any offers to [Foster] prior to [the petitioner's] trial?

"A. Did not.

"Q. Why not?

"A. Because [Foster], we believed, was an important witness in this particular case. We did not want to make an offer to her because we were concerned that a jury

hearing that there was an offer made to her might . . . view her credibility differently if there was a quid pro quo, if you will, offer made, and so we intentionally did [not] make an offer to her, nor did we indicate to her counsel or to [Foster] that we were prepared to make an offer.

"Additionally, I wanted to see all of the information come out, not only from [the petitioner's] trial, but also what information came out . . . at [Schaffer's] trial. So, it wasn't until after all of that information could come out and I had an opportunity to review it and digest it that we made an offer concerning [Foster].

"Q. Okay. So, one of the things you mentioned was that not providing an offer to [Foster] prior to [the petitioner's] trial was important for the state.

"A. Yes."

With respect to the memorandum that Narducci put into Foster's file, he testified that he drafted it following the petitioner's trial and that it memorialized conversations that he had with Kelly following the petitioner's trial. The memorandum dated November 12, 2014, and admitted into evidence at the habeas trial provided in relevant part as follows: "Since the verdict in [the petitioner's criminal trial], I have spoken to [Kelly] on several occasions concerning the ultimate disposition of [Foster's] case. [Kelly] wants to dispose of her case as soon as practicable, and is hoping to either dispose of the case, or address her bond, when he returns from Florida in early December. [The petitioner] is [scheduled] for sentencing on January 6, 2015.

"Initially, I did not think it prudent to address [Foster's] case until after [the petitioner] was sentenced. [Kelly] has pointed out that [Foster] has been tremendously cooperative throughout [Schaffer's] and [the petitioner's] cases (putting aside, for the moment, that

her lack of truthfulness at the outset, and her lack of complete honesty when the police approached her in 2009, is a main contributing factor in the length of these cases). I am now willing to reconsider whether we should attempt to resolve her case next month.

"There have been no discussions concerning a disposition, or even the charges to which [Foster] would plead. [Foster] was made aware of [the] fact [that] there were no promises or offers made, only that, in the past, when a person testifies completely and truthfully, that is taken into consideration in the formation of an offer, and is called to the court's attention. Moreover, she testified [at the petitioner's trial] that she is hoping for some consideration and/or leniency.

"After reviewing the case, [Foster's] professed participation, and her testimony at two [h]earings in [p]roba-ble [c]ause and at two trials, I am inclined to extend an offer of [fifteen] years suspended after [five] years served followed by [five] years of probation on the charges of [h]indering [p]rosecution in the [s]econd [d]egree . . . and [t]ampering with [p]hysical [e]vi-dence . . . . I am willing to listen to [Kelly's] argu-ments on the length of the suspended portion of the sentence."

Narducci testified that, at the time of the petitioner's trial, the state had pending charges against Foster for "accessory murder, felony murder and robbery in the first degree." Consistent with the memorandum, Nar-ducci testified that no formal agreements existed between the state and Foster. Moreover, Narducci testi-fied that the state did not have an informal agreement with Foster to either reduce her bond or pending charges or with respect to any particular sentence in exchange for her testimony at the petitioner's trial. According to Narducci, following the petitioner's con-viction, Kelly approached Narducci about a possible

plea deal. Ultimately, the state offered Foster a plea deal pursuant to which the original charges were substituted with charges for hindering prosecution and tampering with evidence. Narducci testified that the reduced charges were, in his view of her testimony and all other information related to the case, "more in tune with [Foster's] involvement in this particular murder."

At the habeas trial, Narducci testified about the undisputed fact that a substitute information in Foster's file, reflecting the lesser charges that he had negotiated with Kelly, was dated May 20, 2014, prior to the petitioner's criminal trial. Narducci testified that the date on the substitute information was a scrivener's error. He explained: "I know that I had not discussed any changes in the charges prior to [the petitioner's] trial. I know that I did not speak to [Kelly] about any negotiations about the pleas or charges until after [the petitioner's] trial. I know that [the petitioner's] trial was after May 14, 2014. And I know that my practice is, when there are changes and I file a substitute information, I file it either on the day or shortly before there is a plea, that is taken . . . in this case, I believe, [Foster] ended up pleading on May 27, 2015, and I would not have prepared a change of charges in May of 2014. I would have prepared that in May of 2015, and that leads me to the conclusion that that is a scrivener's error."

In its memorandum of decision, the court stated that it had accepted as true the undisputed version of events described by Narducci and reflected in the memorandum that he put into Foster's criminal file. In its analysis of the petitioner's claim of ineffective assistance of trial counsel, the court stated: "[Narducci] testified at the habeas trial that there were no promises or offers made to Foster in exchange for her testimony because Foster was an important witness in the state's case, and the state was concerned a jury would view her credibility differently had such an offer been made. [Narducci]

further indicated that he wanted to review all of the information from Schaffer's trial and the petitioner's trial before making Foster an offer. [Narducci], who also served as the prosecutor in Foster's subsequent criminal case, wrote a note for his file, dated November 12, 2014, in which he indicated that there had been no prior discussions concerning a disposition or substituted charges with Foster, and that Foster had been made aware of the fact that the state had made no promises or offers to her as a result of her testimony.

"[Narducci] further testified that Foster's counsel, [Kelly], approached him regarding a possible plea deal after the petitioner's trial concluded. The state subsequently offered Foster a plea deal that substituted her pending charges to charges of hindering prosecution and tampering with evidence. [Narducci's] office generated a substitute information for Foster in anticipation for her plea and sentencing. The substitute information was dated May 20, 2014, which would have been several months prior to the petitioner's criminal trial, but [Narducci] testified that the recording of that date was a scrivener's error. [Narducci] indicated that his general practice is to file a substitute information shortly before or on the date a plea is taken and because Foster pleaded guilty on May 27, 2015, he would have prepared an amendment of charges in May, 2015, not May, 2014. [Narducci] also testified that the bond reduction to a promise to appear in Foster's file was dated December 11, 2014, after the purported date of the substitute information, but her charges listed the original charges [that he had brought against her] rather than the substituted charges. As a result, [Narducci] concluded that the May 20, 2014 date was recorded in error. The court finds [Narducci's] testimony credible.

"Foster did not testify at the petitioner's habeas trial. At the petitioner's criminal trial, [Marquette] cross-examined Foster regarding any benefit she might

receive from the state for her own charges in exchange for her testimony against the petitioner. Foster denied the existence of a deal but testified that she was hopeful that her testimony would help with her charges. [Marquette] also addressed Foster's potential biases during his closing argument to the jury. Following the petitioner's trial, Foster's attorney, [Kelly], filed a motion for bond reduction, and Foster's bond was reduced from $2.5 million to a promise to appear. At the petitioner's sentencing, [Marquette] raised the issue of Foster's bond reduction with a motion for acquittal based on the state's failure to disclose a deal with Foster. [Narducci] addressed the issue at sentencing and restated that no deal existed between the state and Foster. The court, *Jongbloed, J.*, denied [Marquette's] motion for acquittal.

"Based on the foregoing, the court finds that the petitioner failed to demonstrate the existence of an undisclosed agreement through which Foster would receive consideration from the state in exchange for her testimony at the petitioner's trial. The petitioner has not proven that [Marquette's] performance in addressing such agreement was deficient or that he was prejudiced thereby."

The petitioner does not invite this court to second-guess the court's favorable assessment of Narducci's credibility, but instead argues that the court's ultimate finding, that there was nothing that Narducci was obligated to disclose to him, was erroneous in light of what Narducci admitted having said to Foster. The gist of the petitioner's challenge to the court's finding is that the evidence reflects that, by informing Foster about his past practice involving cooperating witnesses in prior cases, Narducci had in fact suggested to her that the consideration that past witnesses had received in exchange for their testimony was likewise available to her in exchange for her testimony. As the petitioner argues, "Narducci's comments are heavily implying

that, if Foster does what these past cooperating witnesses had, she will reap the same benefits.''

As the precedent discussed previously in this opinion reflects, what constitutes an agreement or understanding between the state and a cooperating witness for *Brady* purposes is broadly defined and must be determined on a case-by-case basis. Evidence of such an agreement is not limited to what might be deemed formal plea agreements pertaining to specific charges, promises to recommend a specific sentence, or even express promises by the state to bring a witness' cooperation to the attention of a sentencing judge. In light of its potentially high value to the defense as fodder for impeachment, evidence that reasonably suggests that an informal understanding between the state and a cooperating witness exists, or reasonably may be viewed as an inducement by the state, falls within the ambit of what must be disclosed. See *State* v. *Ouellette,* supra, 295 Conn. 190; *Turner* v. *Commissioner of Correction,* supra, 181 Conn. App. 758–59.

We recognize that there was no evidence that Narducci had presented Foster with an explicit plea offer that was tailored to the specific charges she faced at the time of the petitioner's criminal trial. Nonetheless, the evidence on which the court relied reflects that Narducci made Foster aware of the state's past practice of providing consideration to cooperating witnesses, specifically, that, ''when a person testifies completely and truthfully, that is taken into consideration in the formation of an offer, and is called to the court's attention.''[7] In light of the undisputed context in which Narducci made these statements to Foster, who was facing

[7] The respondent observes that, although Narducci testified with respect to what he had stated to Foster about the state's past practice of providing consideration to cooperating witnesses, the court, in its findings of fact, did not explicitly refer to this portion of Narducci's testimony. Thus, the respondent argues that ''the court did not find that such a promise ever was conveyed to Foster in any form.''

very serious charges prior to her testimony at the petitioner's criminal trial, the statements strongly suggest that the past practice that Narducci described would apply to Foster if she testified favorably at the petitioner's trial. Thus, the statements reasonably give rise to an understanding that, in exchange for her cooperation, Narducci would provide Foster with a favorable plea deal in connection with her pending charges and bring her cooperation to the attention of the court at the time of her sentencing.

It is of no consequence to our evaluation of Narducci's statements that he did not describe with greater particularity the consideration that he had suggested to Foster in exchange for her testimony or, for that matter, that he testified as to his belief that he had not extended an "offer" to Foster.[8] That Narducci suggested consideration in general terms instead of presenting Foster with a more detailed offer related to her specific charges is unsurprising in light of Narducci's candid testimony that he wanted to prevent the defense from

In light of the fact that the court described Narducci as a credible witness and specifically referred to Narducci's testimony that he had drafted and put the November 12, 2014 memorandum in Foster's criminal file, we are not persuaded by the respondent's argument that the court did not likewise implicitly credit Narducci's uncontradicted testimony about what he had stated to Foster about the state's past practice with cooperating witnesses, as was reflected in Narducci's memorandum.

[8] The respondent argues that "the habeas court credited Narducci's testimony that the state offered no deal in exchange for Foster's testimony. This credibility determination is unassailable on appeal and defeats the petitioner's attempt to establish the prejudice components of . . . his allegation of cause and prejudice." Thus, the respondent appears to argue that, because Narducci opined that his statements to Foster did not amount to an offer of consideration and the court credited that testimony, this court is bound by that opinion. Narducci testified as a fact witness, and this court is bound by the factual representations that were credited by the habeas court. To the extent that Narducci opined during his testimony that his statements did not rise to the level of an offer that should have been disclosed to the defense, such testimony is akin to a legal opinion that is not binding on this court.

being able to use evidence of an offer to challenge her credibility. As the authorities we have cited previously in this opinion reflect, a prosecutor's obligation to disclose evidence that the state induced a cooperating witness to testify, however, is not triggered by a prosecutor's use of talismanic words or phrases, or what might be deemed formalized commitments from the state. Our obligation to protect the petitioner's right to due process counsels against such a mechanistic approach in our evaluation of *Brady* claims.

After applying the proper legal standard to the court's undisputed findings concerning what Narducci stated to Foster, we conclude that Narducci's statements suggested an informal understanding to provide consideration to Foster in exchange for her testimony at the petitioner's trial.[9] Accordingly, we conclude that the state improperly suppressed these statements. Thus, the petitioner has satisfied the first two prongs of *Brady* by demonstrating that the prosecution suppressed evidence that was favorable to the defense. The remaining prong of *Brady* requires an evaluation of whether the

---

[9] Our conclusion that an informal understanding existed is based solely on what Narducci stated to Foster. The undisputed evidence that, following the petitioner's criminal trial, Narducci entered into a plea agreement with Foster does not, in and of itself, reflect that any type of undisclosed suggestion or understanding between the state and Foster existed at the time of the petitioner's criminal trial. See *Shabazz* v. *Artuz*, 336 F.3d 154, 165 (2d Cir. 2003) ("the fact that a prosecutor afforded favorable treatment to a government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony"); see also *Bell* v. *Bell*, 512 F.3d 223, 234 (6th Cir.) (en banc) ("although we do not take issue with the principle that the prosecution must disclose a tacit agreement between the prosecution and a witness, it is not the case that, if the government chooses to provide assistance to a witness following a trial, a court must necessarily infer a preexisting deal subject to disclosure under *Brady*"), cert. denied, 555 U.S. 822, 129 S. Ct. 114, 172 L. Ed. 2d 35 (2008); *Williams* v. *Coyle*, 260 F.3d 684, 707 (6th Cir. 2001) ("[t]he mere fact that [the witnesses'] sentences were later altered is not evidence that a deal existed prior to their testimony at trial"), cert. denied, 536 U.S. 947, 122 S. Ct. 2635, 153 L. Ed. 2d 816 (2002).

suppressed evidence was material. "Not every failure by the state to disclose favorable evidence rises to the level of a *Brady* violation. Indeed, a prosecutor's failure to disclose favorable evidence will constitute a violation of *Brady* only if the evidence is found to be material. The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial . . . . In a classic *Brady* case, involving the state's inadvertent failure to disclose favorable evidence, the evidence will be deemed material only if there would be a reasonable probability of a different result if the evidence had been disclosed. [The] . . . touchstone of materiality is a reasonable probability of a different result, and the adjective [reasonable] is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." (Citation omitted; internal quotation marks omitted.) *Gaskin* v. *Commissioner of Correction*, supra, 183 Conn. App. 529–30.

Our Supreme Court has applied this standard in cases where, as here, the state suppressed evidence that was favorable to the defense in that it could have been used to impeach a cooperating witness, noting that the ultimate inquiry for materiality under *Brady* in such cases is whether there is a "reasonable probability that the jury would have reached a different verdict had

the state disclosed the suppressed evidence." *State* v. *Floyd*, supra, 253 Conn. 746. Our Supreme Court in *Floyd* explained: "The purpose of requiring the state to disclose impeachment evidence to a criminal defendant is to ensure that the jury knows the facts that might motivate a witness in giving testimony . . . . In determining whether impeachment evidence is material, the question is not whether the verdict might have been different without any of [the witness'] testimony, but whether the verdict might have been different if [the witness'] testimony [was] further impeached by disclosure of the [alleged deal]. . . . The fact that the witness' testimony is corroborated by additional evidence supporting a guilty verdict also may be considered in determining whether the suppressed impeachment evidence was material." (Citations omitted; internal quotation marks omitted.) Id., 744.

Finally, we observe that "[a] trial court's determination as to materiality under *Brady* presents a mixed question of law and fact subject to plenary review, with the underlying historical facts subject to review for clear error." *Cator* v. *Commissioner of Correction*, 229 Conn. App. 393, 429,     A.3d     (2024).

Although we recognize that the habeas court did not consider the merits of *Brady*'s materiality prong, we are satisfied that under the unique circumstances of the present case we may do so for four reasons.[10] First, the relevant historical facts concerning the suppressed evidence are not in dispute. Second, the record of the petitioner's criminal trial was presented in evidence at the habeas trial, thereby affording this court with a clear record on which to assess the significance of Foster's testimony with respect to the judgment of conviction and the likely effect, if any, that the disclosure

---

[10] See *Turner* v. *Commissioner of Correction*, supra, 181 Conn. App. 760 (concluding that petitioner suffered *Brady* violation after concluding that habeas court applied incorrect legal standard).

of the suppressed evidence may have had on the jury's assessment of that testimony. Third, in the absence of any issues of fact concerning what was suppressed at trial and the evidentiary basis of the petitioner's conviction, we are left to consider whether the suppressed evidence, if used to impeach Foster, gives rise to a reasonable probability of a different result. This narrow issue presents a question of law over which our review is plenary. Fourth, the parties have availed themselves of the opportunity to address the issue of materiality in their appellate briefs. The respondent, while disputing that the state failed to disclose evidence favorable to the defense, also argues that the evidence at issue was not material under *Brady*. The petitioner, relying on the underlying historical facts that are not in dispute, argues that the evidence was material under *Brady*.

At the habeas trial, the petitioner introduced into evidence a transcript of Foster's testimony at his criminal trial. Foster testified that the petitioner was a frequent visitor when she and Schaffer resided at 119 Salem. During the afternoon of May 14, 2004, Schaffer left their apartment at ArtSpace after he had learned from his mother that someone at 119 Salem, their former residence, was "throwing things in a dumpster." Schaffer was angry because he was supposed to have retrieved items from 119 Salem, including items that belonged to Foster, prior to this time. Schaffer thereafter left the apartment for a period of time. When he returned to their apartment, his clothing had visible bloodstains.

Foster further testified that, after Schaffer returned, he spoke to Dullivan on the phone. Schaffer then told Foster that she had to go somewhere with him. The petitioner drove to their apartment and drove them the short distance to the parking lot of a fast food restaurant that is located behind 119 Salem. As the petitioner, Schaffer, and Foster walked down a path they had used

on prior occasions to reach 119 Salem, Schaffer stated that "they had to make it look like a robbery." When they reached 119 Salem, Foster immediately observed the victim face-down on the ground. Foster heard the victim say, "help me." The petitioner and Schaffer "flipped him over." Schaffer removed the victim's shirt, shoes, and wallet. The petitioner and Schaffer then forcefully kicked the victim and struck his head with a pipe that they found in the nearby garage. Schaffer then placed a bag over the victim's face. The petitioner urged him to "hurry up."

Foster also testified that Schaffer directed her to strike the victim with the pipe so that she "couldn't tell" anyone about what she had observed at the scene. When she was reluctant to comply, Schaffer struck her in the face which caused her nose to bleed. Thereafter, Foster struck the victim with the pipe and kicked him.

Foster testified that a white van was parked in the driveway of 119 Salem. The petitioner and Schaffer retrieved the petitioner's automobile and, at Schaffer's instruction, Foster, following the petitioner's automobile, drove the van from 119 Salem to Mohegan Sun casino. Shortly thereafter, Foster, following the petitioner's automobile, drove the van from Mohegan Sun casino to a Foxwoods Casino commuter lot. At this time, Foster parked the van and got into the backseat of the petitioner's automobile. The petitioner then drove Schaffer and Foster back to ArtSpace and then left to pick up his girlfriend. Foster testified that, while she was living at ArtSpace, there was a cardboard box in her apartment that contained the victim's wallet, a digital camera that Schaffer removed from the van that Foster drove from 119 Salem, a cell phone, and the blood-stained basketball jersey that Schaffer was wearing on May 14, 2004.

The respondent argues that the foregoing testimony was not material because it was "largely corroborated

by both interested and disinterested witnesses who variously saw Foster and the petitioner at the scene, saw the petitioner in possession of items taken from [the victim], heard the petitioner make admissions regarding his participation in [the victim's] murder, and saw the petitioner destroying the items taken from [the victim]." Although the state presented evidence, including testimony from Dullivan and Sebastian, that corroborated portions of Foster's testimony, Foster was the only witness with firsthand knowledge of the specific events leading up to the victim's murder and the nature and extent of the petitioner's violent criminal conduct. No other witness was able to corroborate what Foster observed firsthand, as Schaffer did not testify at the petitioner's trial.[11] The state did not present any forensic evidence tying the petitioner to the crime scene, nor did the petitioner at any time provide a confession to the police with respect to his conduct during the events at issue.[12] After carefully reviewing the evidence presented at the petitioner's criminal trial, we agree with the petitioner that Foster's testimony was crucial to the state's case against the petitioner.[13]

---

[11] The state brought charges against Schaffer in connection with his role in the events underlying the petitioner's conviction. During his criminal trial in 2012, and after several witnesses had testified in the state's case-in-chief, Schaffer elected to plead guilty under the *Alford* doctrine; see *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970); to manslaughter in the first degree and robbery in the third degree. After accepting the plea, the court, *Jongbloed, J.*, imposed a sentence of twenty years of incarceration, execution suspended after fifteen years, followed by five years of probation.

[12] We note that, although the state did not present evidence of a confession by the petitioner, at the petitioner's trial, Sebastian testified that, following the victim's murder, she saw the petitioner making punching and kicking motions while stating that "we fubarred . . . that motherfucker . . . ." Sebastian testified that, because the incident involving the victim was a frequent topic of discussion at that time, she believed that the petitioner was referring to the victim and that the word "FUBAR" was an acronym that stood for "[f]ucked up beyond all recognition."

[13] Our conclusion is consistent with Narducci's testimony at the habeas trial that he had endeavored not to make what he considered to be an "offer" to Foster because, in light of her importance to the state's case, he did not want to damage her credibility in the eyes of the jury.

In an evaluation of the materiality of the suppressed evidence, we must consider whether there is a reasonable probability that the jury would have reached a different verdict if Foster had been further impeached by use of the suppressed evidence at issue. The record of the petitioner's criminal trial reflects that, at the outset of her testimony, Foster stated that she was incarcerated and charged with murder, accessory to murder, burglary and robbery charges in connection with the victim's death. Foster testified that, prior to her incarceration, she had been placed in a witness protection program with her two children.

The following colloquy between Narducci and Foster transpired:

"Q. With respect to your testimony, have any promises been made to you in conjunction with your truthful testimony?

"A. No.

"Q. Have you been offered any sort of consideration or any sort of promise as a result of your testimony?

"A. No.

"Q. Okay. Fair to say that you're hoping to receive some consideration for your truthful testimony?

"A. Yes.

"Q. Okay. Have any promises or consideration been given to you or predicated upon the conviction of a person or persons?

"A. No.

"Q. What do you hope about it?

"A. To be sentenced, I guess, so I can—

"Q. And take into consideration your truthful and complete testimony?

"A. Yes.

"Q. But have any promises, as you sit here today, ever been made to you in terms of leniency for your truthful testimony?

"A. No."

During Foster's cross-examination by the petitioner's trial counsel, the following colloquy occurred:

"Q. You've been arrested at this point?

"A. Yes.

"Q. And presently you're over at York [Correctional Institution]?

"A. Yes.

"Q. And the state has made no promises to you?

"A. That's true.

"Q. Is it fair to say that from your point of view that what happens here in this courtroom will affect what happens to you?

"A. No.

"Q. That's not true?

"A. In my opinion, no."

During closing arguments, Marquette challenged Foster's credibility on several grounds, but he also invited the jury to consider whether the state's witnesses "lied on the witness stand simply to save their own skins or to gain some sort of benefit specific to them." Marquette then stated, "[f]or example, I asked [Foster] about getting less time in jail. I can't remember all the questions that I put to her, but scrutinize her motives."

As the aforementioned evidence reflects, through direct and cross-examination, the jury heard evidence that Foster faced criminal charges and that Foster

hoped for consideration of some type from the state in exchange for her testimony. The defense, therefore, was able to impeach Foster to some extent by demonstrating that she hoped for consideration.[14] Because the state suppressed the evidence of Narducci's statements to Foster in anticipation of her testimony, however, the jury did not learn that Foster's hope for consideration logically could have been based on what she learned from Narducci about his office's past practice of providing specific forms of consideration to cooperating witnesses, namely, consideration "in the formation of an offer" and that a cooperating witness' testimony "is called to the court's attention."

We are persuaded by the petitioner's argument that his impeachment of Foster at trial, with respect to the critical issue of whether her testimony was motivated by her desire to receive consideration from the state, would have been more powerful if the petitioner's trial counsel could have utilized the statements that had been made to her by Narducci. Marquette could have argued to the jury that Foster was not merely being optimistic that the state might provide her with consideration, but that she was testifying with a clear understanding of the state's past practice of providing consideration to cooperating witnesses. See, e.g., *United States* v. *Dvorin*, 817 F.3d 438, 450–51 (5th Cir.) (undisclosed plea agreement with cooperating witness was material for *Brady* purposes because it was more powerful for impeachment purposes than cooperating witness' testimony that he merely hoped he would receive

---

[14] The state does not have a duty to disclose that a cooperating witness merely hopes to receive consideration; its obligation to disclose arises from an affirmative inducement made by the state to a cooperating witness. See *Akrawi* v. *Booker*, 572 F.3d 252, 263 (6th Cir. 2009) ("the mere fact that a witness desires or expects favorable treatment in return for his testimony is insufficient; there must be some assurance or promise from the prosecution that gives rise to a mutual understanding or tacit agreement" (emphasis omitted)).

leniency but had not received any promise from government that he would), cert. denied, 580 U.S. 859, 137 S. Ct. 140, 196 L. Ed. 2d 108 (2016). In light of the foregoing, we are persuaded that, if Foster's testimony was further impeached by disclosure of the representations that Narducci had made to her concerning his office's past practice of providing consideration to cooperating witnesses, there is a reasonable probability that the jury would have reached a different verdict.

Accordingly, we conclude that the habeas court improperly determined that the petitioner's due process claim under *Brady* was procedurally defaulted. We also conclude that the petitioner has demonstrated that a *Brady* violation occurred.

The judgment is reversed and the case is remanded with direction to render judgment granting the petition for a writ of habeas corpus, to vacate the petitioner's conviction of conspiracy to commit murder in violation of §§ 53a-54a and 53a-48 (a) and murder in violation of §§ 53a-54a (a) and 53a-8 and to order a new trial on those offenses.

In this opinion the other judges concurred.